Charles GRIFFIN, William G. Littleton, Jr., Larry McDaniel and Terrell Gray, Individually and On Behalf of All Others Similarly Situated, Plaintiffs,

v.

SMITHFIELD FOODS, INC., and Smithfield Packing Company, Inc., Defendants.

No. Civ.A.2:01–CV–249.

United States District Court, E.D. Virginia, Norfolk Division.

Jan. 2, 2002.

John Caldwell Warley, Wyatt B. Durette, Jr., Durette, Irvin & Bradshaw, Richmond, VA, Joe R. Whatley, Jr., Whatley Drake, LLC, Birmingham, AL, Herman Watson, Jr., Watson, Jimmerson, Givhan & Martin, PC, Huntsville, AL, William Sims Stone, Blakely, GA, David Bois, Timothy D. Battin, Staus & Boies, LLP, Fairfax, VA, for plaintiffs.

John Yeardley Pearson, Jr., Willcox & Savage, Norfolk, VA, Dawn Gantt Benson, Albany, GA, Stephen Curtis Carlson, Susan Ann Stone, Sidley Austin Brown & Wood, Chicago, IL, Wendell Landray Taylor, Robert Reynold Merhige, IV, Thomas Glascock, Hunton & Williams, Richmond, VA, John Samuel Martin, Hunton & Williams, Richmond, VA, for defendants.

### ORDER AND OPINION

MORGAN, District Judge.

This matter comes before the Court on the Defendants' motion for summary judgment. The Court held a hearing on this motion on November 21, 2001. For the following reasons, the Court GRANTS the Defendants' motion, and enters JUDGMENT in for the Defendants.

## I. FACTUAL[1] AND PROCEDURAL BACKGROUND

Over the past decade, Smithfield Foods, and its wholly owned subsidiary Smithfield Packing (collectively referred to as "Smithfield"), have steadily been acquiring greater numbers of their hogs through contractual arrangements and direct ownership— what is referred to in the industry as "vertical integration." This means they have been acquiring few hogs on what is referred to in the industry as "cash markets," which used to be the predominate source of Smithfield's hog acquisition. As the largest pork packer in the world, Smithfield's virtual exit from the cash markets understandably caused some financial hardship to those hog producers who depended on receipts from these cash markets. Believing that Smithfield's actions were anti-competitive, discriminatory and deceptive, the Plaintiffs filed suit under the Packers and Stockyards Act of 1921 (the "PSA" or the "Act"). Particularly, the Plaintiffs claim Smithfield's conduct is illegal because "it is unfair and has the *effect* of manipulating or controlling prices or restraining commerce."(Emphasis original.) Plaintiff's Mem. in Op. to Sum.Jud. at 13. They go on to allege, "Defendant's forward contracts and agreements constitute an unreasonable preference under the Act." *Id.*

The Plaintiff's originally filed this suit in the U.S. District Court for the Middle District of Georgia in December 1999. At the time, the two named plaintiff's were

---

1. This opinion views the facts and all legitimate inferences therefrom in the light most favorable to the plaintiffs.

Larry McDaniel and Terrell Gray, both of Alabama. The Defendants, the same as in this action, moved to dismiss or transfer to the Eastern District of Virginia. The Georgia Court granted the Defendants' motion, but also gave the Plaintiffs the option of dismissing without prejudice. The Plaintiffs asked the District Judge to dismiss, in lieu of transferring.

On April 7, 2000, the case was re-filed in the Middle District of Georgia after two Georgians were added as lead plaintiffs. After a motion by Smithfield Packing, the case was transferred from Georgia to the Eastern District of Virginia on March 30, 2001. In its order, the Georgia District Court did not specify the division of the Eastern District to which it intended to transfer the cause of action. The case was assigned to the Norfolk Division. Subsequently, Smithfield asked this Court to transfer the case to the Richmond Division.[2] Said request was denied by the Court.

Smithfield then asked the Court to dismiss the action for failure to state a claim upon which relief can be granted pursuant to Federal Rule of Civil Procedure (FRCP) 12(b)(6). Finding that the Plaintiffs arguably alleged the Defendants' actions were motivated by an improper purpose, which might have been actionable under the PSA, the Court denied Smithfield's motion to dismiss.

The Defendants return, moving for summary judgment relying upon FRCP 56.

## II. THE STANDARD

District courts may enter summary judgment only when there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. *See Miller v. Leathers*, 913 F.2d 1085, 1087 (4th Cir.1990) (en banc) *cert. denied*, 498 U.S. 1109, 111 S.Ct. 1018, 112 L.Ed.2d 1100 (1991). The facts and inferences to be drawn from the pleadings must be viewed in the light most favorable to the nonmoving party. *See Nguyen v. CNA Corp.*, 44 F.3d 234, 237 (4th Cir.1995). Summary judgment is appropriate when the record, taken as a whole, could not lead a rational trier of fact to find for the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–49, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

In order to defeat a motion for summary judgment, a plaintiff cannot rely on "mere belief or conjecture, or the allegations and denials contained in his pleadings." *Doyle v. Sentry Insur.*, 877 F.Supp. 1002, 1005 (E.D.Va.1995) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). Rather, the nonmoving party must set forth specific facts through affidavits, depositions, interrogatories, or other evidence to show genuine issues for trial. *See Celotex*, 477 U.S. at 324, 106 S.Ct. 2548. When a plaintiff fails to make a sufficient showing establishing an essential element of his case and the plaintiff bears the burden of proof on that issue, "there is 'no genuine issue of material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other fact immaterial." *Celotex*, 477 U.S. at 323, 106 S.Ct. 2548; *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

While "it is the province of the jury to resolve conflicting inferences from circumstantial evidence, . . . it is the duty of the court to withdraw the case from the jury when the necessary inference is so tenuous

---

2. The Court entered a consent order on July 16, 2001, dismissing Defendant IBP from the cause of action for lack of personal jurisdic-tion; Smithfield and its wholly owned subsidiary are the only Defendants remaining.

that it rests upon speculation and conjecture." *Ford Motor Co. v. McDavid,* 259 F.2d 261 (4th Cir.1958). Such an approach protects against the danger that a jury will make a decision based on sheer speculation, tainted by impermissible factors such as jury sympathy. *Lovelace v. Sherwin–Williams Co.,* 681 F.2d 230, 242 (4th Cir. 1982).

### III. THE PACKERS AND STOCKYARDS ACT

"The PSA was enacted in 1921 to regulate the business of packers by forbidding them from engaging in unfair, discriminatory or deceptive practices in [interstate] commerce, or subject any person to unreasonable prejudice therein, or to . . . control prices or establish a monopoly in the business." *Philson, et al. v. Cold Creek Farms, Inc., et al.,* 947 F.Supp. 197, 200 (E.D.N.C.1996); *see also* 7 U.S.C. § 192(a). The broad mandate of § 192(a) must be viewed in light of the fact that it was designed to end the rampant corruption that existed at the time of its passage. *Id.* "Consequently, only those unfair, discriminatory or deceptive practices adversely affecting competition are prohibited by the Act." *Id.*

As it relates to the Plaintiffs' allegations, the PSA does not allow a packer to: (1) engage in unfair unjustly discriminatory or deceptive practices; (2) make or give undue or unreasonable preferences or advantages; (3) engage in market manipulation; or (4) conspire to manipulate the market. *See* 7 U.S.C. § 192. As of a 1976 amendment to the PSA, private parties injured by illegal activities of a packer may bring a claim. 7.U.S.C. § 209.

### IV. ANALYSIS

The Plaintiffs contend that Smithfield's direct ownership of and contractual acquisitions of hogs violates the PSA. The Plaintiffs admit that none of the Defendants' actions are illegal in and of themselves when viewed individually. However, they allege that when these actions are viewed as an integrated strategy, it is apparent that they are unfair, discriminatory or deceptive practices that subject them to undue prejudice proscribed by the PSA. In essence, the Plaintiffs ask that Defendants' business actions, while not illegal individually, be added together to create a violation of the PSA. This Court DOES NOT FIND that the sum of the Defendants' legitimate business actions, by some synergistic combination, creates a cause of action for the Plaintiffs.

The Plaintiffs cause of action is admittedly novel. Neither party has cited a single case or administrative ruling under the PSA proscribing the type of vertical integration of livestock acquisition of which the Plaintiffs complain. Over the last 50 years, while the PSA has been federal law, the poultry and beef industries have vertically integrated to different degrees, without Court or administrative interference. Since 1976, when the PSA first specifically allowed a private cause of action, none has been filed with allegations that resemble the plaintiffs' complaint. While such a lack of precedent is not necessarily fatal to the Plaintiffs' claim, it offers no support for the Plaintiffs' interpretation of the PSA.

The PSA has been used over the years to stop collusive activity among competing entities.[3] Here the complaint names only

---

**3.** *See, e.g., Farmers' Livestock v. U.S.,* 54 F.2d 375 (E.D.Ill.1931) (The PSA was designed to prevent group boycotts); *Swift & Co. v. United States,* 308 F.2d 849 (7th Cir.1962) (Two competitors decided one would no longer compete in the market, and instead agreed to purchase their requirements from one another. The Court held the agreement was unlawful, but noted competitors could not be ordered to compete if they chose to do so independently); *De Jong Packing Co. v. U.S. Dep't of Agriculture,* 618 F.2d 1329, 1335 (9th

related entities. The Plaintiffs impliedly acknowledge the lack of improper intent when they write, "Apparently, Smithfield gave no consideration to the impact that its vertical integration would have on the cash market." Def.Mem. in Op. to Sum. Jud. at 8. Plaintiffs argue they do not need the usual improper intent to fit their lawsuit within the wording of the PSA; they argue that all they need is an *effect* that is unfair, discriminatory or deceptive and therefore subjects them to undue prejudice. Instead of citing collusive conduct among competing entities, the Plaintiffs allege that Smithfield's series of acquisitions of competing packers and its development of sources of supply of its raw materials is somehow internally collusive. Firstly, mergers and acquisitions are closely monitored and regulated. Secondly, there is no evidence that the particular actions of which the Plaintiffs complain [4] were motivated by anything other than considerations of quality control and efficiency.

Furthermore, it has been long established that the intent of the PSA is not to "upset the traditional principles of freedom of contract." *Jackson v. Swift Eckrich, Inc.*, 53 F.3d 1452, 1458 (8th Cir.1995). "The [Act] was designed to promote efficiency, not frustrate it." *IBP v. Glickman*, 187 F.3d 974, 978 (8th Cir.1999) (quoting *Jackson, supra*). The Defendants' motivation in moving toward a vertically integrated system of hog acquisition was plainly *efficiency*. Plaintiffs proffer no evidence to dispute that. Smithfield, in order to compete more effectively in the meat market, decided they required a more stable supply of consistently high quality hogs. See Def.Mem. in Sup. of Sum.Jud. at 3. The Defendants decided that the guess work required to fulfill their needs at cash markets was inefficient for themselves and the consumer. *Id.* at 4. Vertical integration also allows Smithfield greater control over the types of meat different markets demand. *Id.*

The pork industry does not exist in isolation within the meat market or under law. Pork is just one aspect of the wider meat market. To restrain vertical integration in the pork industry would have implications in other meat industries, such as poultry and beef. The Plaintiffs have not sought to join the ranks of contract suppliers of hogs to the defendants. Such contract suppliers are subject to timing and quality control standards that the Plaintiffs find an affront to their independence.[5] While such independence may be a virtue in many respects, the family farm, the corner grocer and the main street specialty store have all fallen victim to the direction in which the country's economy has developed. No degree of sympathy for the Plaintiffs' difficulty in maintaining their traditional way of doing business translates to wrongdoing on the part of the Defendants.

Cir.1980) (Prohibiting actions of businesses that were designed to secure favorable contract terms from others noting, "[A] competitor 'can do many things independently which he may not combine with others to accomplish.' "); *Capitol Packing Co. v. United States*, 350 F.2d 67 (10th Cir.1965) (A refusal to do business with another livestock agency because of a loan received from another livestock agency is collusive, and therefore a violation of the PSA).

4. Namely, (1) the acquisition of competing producers; (2) the acquisition of sources of supply, and contracts with hog producers; and (3) the closing of obsolete or inefficient packing operations and replacing some with newer and more efficient plants.

5. Although one Plaintiff is a contract supplier in the poultry industry, the very conduct in which he participates is complained of in the case at bar.

A regulation of the type the Plaintiffs ask the Court to read into the PSA has been adopted by the Iowa state legislature. Initially the Court was troubled by the Plaintiffs' reference to an exclusive supply contracts that Smithfield had with a competitor. However, the evidence reveals that Smithfield is not permitted to raise hogs in Iowa for packing operations in that state by a state statute.[6] Not wishing to divest itself of one of its more productive hog raising operations, it chose instead to supply hogs to a competitor.[7] The contract looks collusive, but in actuality is mandated by state law. The existence of this state legislation suggests that the PSA does not proscribe vertical integration as argued by the Plaintiffs. More importantly, the statute illustrates the proposition that the power to control vertical integration lies with the legislative branch, not the judiciary.

The Plaintiffs' cause of action is further complicated by a remedy that is vague and unworkable. In their complaint, they list their damages as "undetermined." Compl. at ¶¶ 53–54. When pushed further on the question of remedies during discovery, they all replied that there damages were equal to "The difference between what the cash market would have been absent the defendant's Captive Supply arrangements

---

**6.** Iowa Code CHAPTER 9H. CORPORATE OR PARTNERSHIP FARMING

9H.2 Prohibited operations—exceptions.

In order to preserve free and private enterprise, prevent monopoly, and protect consumers, it is unlawful for any processor of beef or pork or limited partnership in which a processor holds partnership shares as a general partner or partnership shares as a limited partner, or limited liability company in which a processor is a member, to own, control or operate a feedlot in Iowa in which hogs or cattle are fed for slaughter. In addition, a processor shall not directly or indirectly contract for the care and feeding of swine in this state. However, this section does not apply to a cooperative association organized under chapter 497, 498, 499, or 501, if the cooperative association contracts for the care and feeding of swine with a member of the cooperative association who is actively engaged in farming. This section does not apply to an association organized as a cooperative in which another cooperative association organized under chapter 497, 498, 499, or 501 is a member, if the association contracts with a member which is a cooperative association organized under chapter 497, 498, 499, or 501, which contracts for the care and feeding of swine with a member of the cooperative who is actively engaged in farming. This section shall not preclude a processor, limited partnership, or limited liability company from contracting for the purchase of hogs or cattle, provided that where the contract sets a date for delivery which is more than twenty days after the making of the contract it shall:
1. Specify a calendar day for delivery of the livestock; or
2. Specify the month for the delivery, and shall allow the farmer to set the week for the delivery within such month and the processor, limited partnership, or limited liability company to set the date for delivery within such week. This section shall not prevent processors or educational institutions from carrying on legitimate research, educational, or demonstration activities, nor shall it prevent processors from owning and operating facilities to provide normal care and feeding of animals for a period not to exceed ten days immediately prior to slaughter, or for a longer period in an emergency. Any processor or limited partnership which owns, controls, or operates a feedlot on August 15, 1975, shall have until July 1, 1985, to dispose of the property. A processor which is in compliance with this section prior to April 5, 2000, and which is in violation of this section as a result of 2000 Iowa Acts, chapter 1048, shall have until July 1, 2004, to comply with 2000 Iowa Acts, chapter 1048. A processor shall not take action on or after April 5, 2000, which would be in violation of this section.

**7.** Smithfield Foods' Murphy Farms division in that state may not sell hogs to other Smithfield businesses.

and ownership versus what the actual cash market price was during the class period." [8] There is no legal basis upon which a Court or a jury could devine such a speculative calculation of damages.

The very uniqueness of the Plaintiffs' theory renders their claim more difficult to address directly. Here the Plaintiffs' complaint is not directed at how Smithfield did business with them but instead is directed at Smithfield's failure to do business with them.[9] The Plaintiffs' evidence demonstrates that economic developments in their industry have overtaken them; their evidence does not demonstrate that their economic woes were caused by any actionable wrongdoing of Smithfield under the PSA or any other theory.

## V. Conclusion

For the reasons stated, the Court FINDS that the Plaintiffs have not proffered evidence that establishes a cause of action for damages against Smithfield Foods or Smithfield Packing for violating the PSA. Accordingly, the Court GRANTS the Defendants' motion, and enters summary judgment for the Defendants.

The Clerk is **REQUESTED** to send a copy of this order to all counsel of record.

It is so **ORDERED.**

---

8. Gray Disc.Resp. at 4; Littleton Disc.Resp. at 4; McDaniel Disc.Resp. at 5.

9. With the exception of one Plaintiff having dealt with Smithfield at one cash market on a limited basis, the evidence indicates *no* dealings between the parties.